# United States Court of Appeals for the Federal Circuit

―――――――

**SIKORSKY AIRCRAFT CORPORATION,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

―――――――

2013-5096, -5099

―――――――

Appeals from the United States Court of Federal Claims in Nos. 09-CV-0844 and 10-CV-0741, Judge Charles F. Lettow.

―――――――

Decided: December 10, 2014

―――――――

JEFFREY A. HALL, Bartlit Beck Herman Palenchar & Scott LLP, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief was KATHERINE M. SWIFT. Of counsel on the brief was KAREN L. MANOS, Gibson, Dunn & Crutcher LLP, of Washington, DC.

JAMES W. POIRIER, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were STUART F. DELERY, Assistant Attorney General, BRYANT G. SNEE, Acting Director, and STEPHEN J. GILLINGHAM, Assistant Director.

Of counsel on the brief were KATHLENE P. MALONE, Defense Contract Management Agency, of Boston, Massachusetts, and DAVID C. HOFFMAN, Defense Contract Audit Agency, of Fort Belvoir, Virginia.

———————————

Before DYK, TARANTO, and CHEN, *Circuit Judges.*

DYK, *Circuit Judge.*

Sikorsky Aircraft Corporation ("Sikorsky") has had a number of government contracts that are subject to the government Cost Accounting Standards ("CAS").[1] These standards govern the allocation of costs among the various contracts being performed by a government contractor. Allocation of costs between government contracts and non-government (or commercial) contracts is particularly important.

Between 1999 and 2005, Sikorsky allocated its materiel overhead costs as between government and non-government contracts according to a direct labor base. The question is whether this was consistent with the CAS. The government contracting officer issued a final decision against Sikorsky, finding Sikorsky's allocations between 1999 and 2005 noncompliant with CAS 418 and concluding that Sikorsky owed the government approximately $65 million in principal and $15 million in interest. Sikorsky filed a complaint with the Court of Federal Claims (the "Claims Court") challenging this determination. The Claims Court held that the government failed to establish by a preponderance of the evidence that Sikorsky violated CAS 418. We affirm.

———————————

[1]　The Cost Accounting Standards are codified at 48 C.F.R. §§ 9904.401–9904.420.

BACKGROUND

During the period in question (1999–2005), Sikorsky held a number of contracts with the United States government to furnish helicopters and other goods and services. Sikorsky also sold aircraft and other goods and services to commercial customers.

Sikorsky's government contracts were subject to the CAS. The CAS are a set of nineteen standards promulgated by the Cost Accounting Standards Board ("CASB"). At issue in this case is the application of CAS 418, which pertains to the "[a]llocation of direct and indirect costs." 48 C.F.R. § 9904.418.

Direct costs can be allocated to a particular cost objective (a contract).[2] CAS 418 governs how indirect costs are allocated to government cost objectives. *See id.* § 9904.418-20. Unlike direct costs, indirect costs are not directly related to one particular cost objective (or contract).[3] *See id.* § 9904.418-30(a)(2)–(3). Therefore, an allocation base (or allocation method) is used to allocate indirect costs to cost objectives. *See id.* § 9904.418-40(c). The allocation base allows measurement of the quantity of

---

[2] A direct cost is defined as "any cost which is identified specifically with a particular final cost objective." 48 C.F.R. § 9904.418-30(a)(2). For example, labor wages of a worker on a production line are direct labor costs which can be allocated directly to a contract. These labor costs can usually be easily tracked according to how much time a worker spends on a particular product being manufactured and, in turn, the associated cost objective.

[3] An indirect cost is defined as a cost "not directly identified with a single final cost objective" and instead is "identified with two or more final cost objectives or with at least one intermediate cost objective." 48 C.F.R. § 9904.418-30(a)(3).

costs in an indirect pool attributable to a given cost objective. *See id.* The allocation base used must allocate pooled indirect costs to cost objectives in "reasonable proportion" to the relationship between the indirect costs and the cost objective. *Id*. For example, direct cost may be used as an allocation base if the amount of direct costs consumed by a cost objective is correlated to the indirect costs consumed by that cost objective.

Sikorsky collected its materiel overhead costs in an indirect cost pool.[4] Materiel overhead costs included the costs of purchasing and handling materiel, which Sikorsky's labor force used to manufacture and assemble aircraft and parts. The purchasing activities included issuing requests for price quotations to suppliers, negotiating pricing, drafting purchase orders, and coordinating parts delivery schedules with suppliers. The materiel handling (or, in other words, materiel logistics) costs included costs attributable to master scheduling, parts and requirements planning, receiving, internal transportation, trucking, traffic, warehousing, kitting, area control stations, and expediting. These materiel overhead costs were indirect costs related to multiple contracts.

Ideally, materiel overhead costs could be allocated using a base of the direct materiel costs. Sikorsky determined that such an allocation method would result in a distortion. This is so because Sikorsky is required by the government to use substantial amounts of government

---

[4]    This overall pool was allocated into some intermediate sub-pools, apparently according to geography. The creation of these sub-pools has not been shown to be relevant in the overall legal analysis. In any event, CAS 418-60(f) provides an example in which intermediate pools are used in the context of materiel costs, establishing that the use of intermediate pools is not improper. 48 C.F.R. § 9904.418-60(f).

furnished materiel ("GFM"), which is provided by the government to Sikorsky for use in its government contracts. GFM includes engines, hovering infrared suppression systems and auxiliary power units, crash seats, support equipment, and radios. GFM is not included in Sikorsky's direct materiel cost base. Sikorsky's only costs for this GFM are materiel overhead (handling and storage) costs, which are increased even though the government provides the GFM. For its commercial contracts, Sikorsky incurs direct materiel costs in addition to materiel overhead costs. Therefore, allocation of materiel overhead in proportion to direct materiel costs as between government and commercial contracts would assign too little to the former and too much to the latter.

Before 1999, Sikorsky allocated its materiel overhead costs using an allocation base of direct materiel costs minus certain costs incurred for commercial contracts, namely commercial aircraft engines and used helicopters. These commercial costs were subtracted in order to compensate for the exclusion of GFM from the direct materiel cost base.

However, Sikorsky concluded in 1998 that the base it used prior to 1999 did not adequately compensate for the government-favoring distortions caused by the exclusion of GFM from direct materiel costs. Sikorsky changed its allocation method effective January 1, 1999. Between 1999 and 2005, Sikorsky allocated its materiel overhead costs to government cost objectives using a direct labor base. In other words, Sikorsky allocated its materiel overhead costs in proportion to the direct labor costs consumed by each cost objective, that is, each contract.

Although Sikorsky believed its use of a direct labor base was compliant with the CAS, it changed its allocation method effective January 1, 2006, after the period in question. Under its new allocation method, Sikorsky allocated purchasing costs according to a base of direct

materiel costs minus the costs of commercial aircraft engines. Sikorsky continued to allocate materiel handling costs according to a direct labor base. The government contracting officer approved this new accounting method as compliant with the CAS.

However, in March 2007, the contracting officer issued a notice of potential noncompliance with CAS 418 during the period from 1999–2005. On December 11, 2008, the contracting officer issued a final determination that Sikorsky was noncompliant with CAS 418 between 1999 and 2005, with the noncompliance becoming material in 2003. The contracting officer determined that Sikorsky owed approximately $65 million in principal and $15 million in interest to the government.

Sikorsky appealed the government's claim to the Claims Court on December 8, 2009, pursuant to 28 U.S.C. § 1491(a)(2) and 41 U.S.C. § 7104(b). The Tucker Act provides not only for jurisdiction of the Claims Court over suits to recover money from the federal government but also for jurisdiction over suits pertaining to "any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including . . . compliance with cost accounting standards." 28 U.S.C. § 1491(a)(2); *see Garrett v. Gen. Elec. Co.*, 987 F.2d 747, 750 (Fed. Cir. 1993). Sikorsky thereafter filed a second suit asking the Claims Court to determine the validity of certain affirmative defenses that Sikorsky asserted to the government's claim. The two suits were consolidated. The government counterclaimed for the approximately $65 million plus interest that it claimed Sikorsky owed the government.

On appeal, the parties address only two of Sikorsky's defenses: 1) that the government's claim was barred by the statute of limitations of the Contract Disputes Act ("CDA"), codified at 41 U.S.C. § 7103(a)(4)(A); and 2) that Sikorsky had not violated the CAS. After trial, the Claims Court granted judgment to Sikorsky. The court character-

ized the statute of limitations issue as an affirmative defense, assigning the burden of proof to Sikorsky. The court rejected Sikorsky's statute of limitations defense, holding that Sikorsky had failed to meet its burden of showing that the government had actual or constructive knowledge of a potential claim more than six years before the government submitted its claim to Sikorsky. The court then addressed Sikorsky's alleged CAS 418 violation. The court held that CAS 418-50(e) was applicable to Sikorsky's cost pool. Applying CAS 418-50(e), the court held that the government failed to establish by a preponderance of the evidence that Sikorsky's direct labor base was not an appropriate allocation method.

The government appealed.[5] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I

Initially, we consider the statute of limitations issue. Sikorsky argues that the government's claim is barred by the six-year statute of limitations set forth in 41 U.S.C. § 7103(a)(4)(A). Section 7103(a)(4)(A) states that "[e]ach claim by a contractor against the Federal Government relating to a contract and each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). A claim accrues as of "the date when all events, that fix the alleged liability of

---

[5]     Sikorsky also filed a cross-appeal on the statute of limitations issue. This cross-appeal was improper because it merely presented an alternative ground for affirming the trial court. *See Roberts v. United States*, 745 F.3d 1158, 1160 n.1 (Fed. Cir. 2014) (citing *Bailey v. Dart Container Corp. of Mich.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002)). We dismiss the cross-appeal.

either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred." 48 C.F.R. § 33.201. A claim is submitted by the government when the contracting officer renders a final decision to the contractor. *See United States v. T & W Edmier Corp.*, 465 F.3d 764, 766 (7th Cir. 2006); *Malone v. United States*, 849 F.2d 1441, 1443 (Fed Cir. 1988), *modified*, 857 F.2d 787 (Fed. Cir. 1988); *see also* 48 C.F.R. § 2.101 ("Claim means a written demand or written assertion by one of the contracting parties, seeking, as a matter of right, the payment of money . . . .").

The parties and the Claims Court agree that the date of the government's submission of the claim here was December 11, 2008, the date on which the contracting officer submitted his final decision to Sikorsky. The statute of limitations was satisfied if the claim accrued within the six years before December 11, 2008. *See Motorola, Inc. v. West*, 125 F.3d 1470, 1473 (Fed. Cir. 1997); 48 C.F.R 33.206(b) ("[t]he contracting officer shall issue a written decision on any Government claim initiated against a contractor within 6 years after accrual of the claim . . . .").

Sikorsky argues that we must decide the statute of limitations issue before addressing the merits because the six-year limitations period in the CDA is jurisdictional. We disagree. To be sure, we have previously characterized the six-year limitation in the CDA as jurisdictional, most recently in *Systems Development Corp. v. McHugh*, 658 F.3d 1341, 1347 (Fed. Cir. 2011).[6] However, our decision

---

[6] Earlier cases such as *Arctic Slope Native Assoc., Ltd. v. Sebelius,* 583 F.3d 785, 793, 800 (Fed. Cir. 2009), and *England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1379

in *Systems Development* was effectively overruled by the Supreme Court's more recent decision in *Sebelius v. Auburn Regional Medical Center*, 133 S. Ct. 817 (2013), the latest in a series of Supreme Court opinions that have articulated a more stringent test for determining when statutory time limits are jurisdictional.[7]

In *Auburn Regional*, the Supreme Court held that the 180-day limit in 42 U.S.C. § 1395oo(a)(3) was not jurisdictional. 133 S. Ct. at 826. That statutory provision limited the time for appeals of reimbursement amount determinations by Medicare providers to a government administrative agency, setting a 180-day time limit. *Id.* at 821.

The Supreme Court noted that it has "repeatedly held that filing deadlines ordinarily are not jurisdictional;" instead, they are "'quintessential claim-processing rules.'" *Id.* at 825 (quoting *Henderson v. Shinseki*, 131 S. Ct. 1197, 1203 (2011)). The Court articulated a "readily administrable bright line" rule, under which the inquiry is "whether Congress has clearly stated that the rule is jurisdictional; absent such a clear statement, [the Court has] cautioned [that] courts should treat the restriction as nonjurisdictional in character." *Id.* at 824 (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515–16 (2005)) (internal quotation marks omitted). Congress need not "incant magic words ['jurisdictional'] in order to speak clearly," and render the provision jurisdictional. *Id.* The statutory language, *see id.* at 824–25, the placement of the provision within the statutory scheme, *Henderson*, 131 S. Ct. at 1205; *see Auburn Reg'l*, 133 S. Ct. at 825, and "context, including [Supreme Court] interpretations

---

(Fed. Cir. 2004), also included language suggesting that the statute of limitations in the CDA is jurisdictional.

[7]    *See, e.g.*, *Henderson v. Shinseki*, 131 S. Ct. 1197 (2011); *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010); *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2005).

of similar provisions in many years past," *Auburn Reg'l*, 133 S. Ct. at 825 (internal quotation marks and citations omitted), are indicative of whether the provision is jurisdictional.

Here, § 7103 "does not speak in jurisdictional terms" or refer in any way to the jurisdiction of the Claims Court. *Id.* (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). The language of § 7103 also "do[es] not suggest, much less provide clear evidence, that the provision was meant to carry jurisdictional consequences." *See Henderson*, 131 S. Ct. at 1204. "Nor does [§ 7103's] placement within the [CDA] provide . . . an indication" that the provision is jurisdictional. *Id.* at 1205.

The context of the statute also does not suggest that it is jurisdictional. Insofar as it applies to claims by the government, the statute pertains to the submission of a claim by a contracting officer to a contractor, rather than to a government body. The statute of limitations in this case, therefore, is even less likely to be jurisdictional than the statute at issue in *Auburn Regional*. This is also not a situation in which longstanding precedent interprets the provision as jurisdictional. By contrast, in *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2007), the Supreme Court held that 28 U.S.C. § 2501, providing a 6-year statute of limitations for filing claims with the Court of Federal Claims, was jurisdictional because "principles of stare decisis" required that the Court comport with a long line of previous cases describing that particular statute of limitations as jurisdictional. Similarly, in *Bowles v. Russell*, 551 U.S. 205, 209 n.2 (2007), the court recognized the influence of "a century's worth of precedent and practice in American courts" when it held that 28 U.S.C. § 2107, providing for a 30-day limit on filing an appeal, was jurisdictional. Unlike those cases, 41 U.S.C. § 7103 does not have any long-standing interpretation by the Supreme Court which would counsel that we interpret the 6-year limitation as jurisdictional.

In other words, § 7103 does not have any special characteristic that would warrant making an exception to the general rule that filing deadlines are not jurisdictional. We conclude that § 7103 is not jurisdictional and need not be addressed before deciding the merits. Because we affirm the Claims Court on the merits, we do not address whether § 7103 was satisfied in this case. We note that the District of Columbia Circuit has also concluded that the six-year limitation is non-jurisdictional. *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 526 (D.C. Cir. 2010) (holding that 41 U.S.C. § 605(a), a predecessor to § 7103, was not jurisdictional).

## II

We next turn to the issue of Sikorsky's compliance with CAS 418. The government bears the burden of proving Sikorsky's noncompliance. *Raytheon Co. v. United States*, 747 F.3d 1341, 1352 (Fed. Cir. 2014). We review the decision of the Claims Court de novo for errors of law, including legal interpretations of the CAS. *Id.* at 1348; *Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361 (Fed. Cir. 2003). We review the Claims Court's factual findings for clear error. *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1171 (Fed. Cir. 1991).

At its most basic level, the government's argument is easy enough to follow. The government contends that Sikorsky's materiel overhead pool should have been allocated using a direct materiel base rather than a direct labor base. According to the government, this approach is mandated by CAS 418-50(d), which the government argues should govern rather than CAS 418-50(e), which the Claims Court held was applicable, agreeing with Sikorsky. The central question is thus whether Sikorsky's materiel overhead pool is governed by CAS 418-50(d) or CAS 418-50(e).

The first question is the standard for determining when subsections (d) and (e) apply. CAS 418-50(d) pro-

vides, in relevant part, for "[a]llocation measures for an indirect cost pool which *includes a material amount of the costs of management or supervision* of activities involving direct labor or direct material costs." 48 C.F.R. § 9904.418-50(d) (emphasis added). CAS 418-50(e) provides, in relevant part, for "[a]llocation measures for indirect cost pools that *do not include material amounts of the costs of management or supervision* of activities involving direct labor or direct material costs." *Id.* § 9904.418-50(e) (emphasis added).

On the face of these provisions, the test for determining whether subsection (d) or (e) applies is whether the pool "includes a material amount of the costs of management or supervision." *Id.* § 9904.418-40(d). The government argues that, contrary to the language of subsections (d) and (e), the applicability of these provisions does not in fact depend on whether the indirect cost pool includes a material amount "of the costs of management or supervision of activities involving direct labor or direct material costs." 48 C.F.R. §§ 9904.418-50(d), (e). Rather, the government contends that CAS 418(d) applies to overhead pools, and CAS 418(e) applies to service center and expense pools. The CAS do not define the terms "overhead pool" or "service center." However, the first proposed version of the CAS provided definitions. A "service center" was defined as "[a]n intermediate cost objective which accumulates cost of services provided to other cost objectives, which services can be identified specifically with such other cost objectives." 43 Fed. Reg. 11120. An "overhead pool" was defined as "[a] cost pool used to accumulate the indirect costs of a productive function or productive activity." *Id.* at 11122. The government contends that the pool here falls within subsection (d) because it is an overhead pool. In large part, the government's argument in these respects is difficult to follow, to put it charitably.

The government suggests that internal government documents concerning the history of the CAS provisions and other materials which were not published provide support for the government's argument about the rule's meaning. Those unpublished materials are not relevant to our interpretive task. The CAS standards, like any other regulation, must be interpreted based on public authorities. Interpretation of CAS standards is a legal issue which should "be approached like other legal issues— based on briefing and argument by the affected parties." *Rumsfeld*, 315 F.3d at 1369; *see Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003) (refusing to consider unpublished materials in interpreting CAS 413); *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137–38 (Fed. Cir. 1995) (looking to the text of the CAS, including the included illustrations, and to the preambles to interpret the CAS). In *Rumsfeld*, we held that CAS standards were not properly interpreted by considering the "views of . . . self-proclaimed CAS experts," including a former CASB employee. 315 F.3d at 1369. As a result, the government prevailed. *Id.* at 1367, 1369, 1372. The government now seeks to disregard the rule from *Rumsfeld* barring reliance on unpublished materials when it serves the government's interests. There is no basis for such an approach. The unpublished history of the rule is not pertinent to its interpretation. Rather we turn to the language of the rule and, where necessary, the history of the rule as published in the Federal Register. The plain language of CAS 418 answers the question here—the materiality test governs.

The government's one argument for departing from the language of the rule itself based on published materials rests on what the government characterizes as the "preamble" to CAS 418-50(d) and (e)[8] contained in the

---

[8] The "preamble" states:

order adopting the final rule in 1980. *See* 45 Fed. Reg. 31931. The "preamble" itself is not a model of clarity, but it may be read to support the government's argument that subsection (e) is concerned with service center pools, or at least that service center pools fall within subsection (e). But we decline to rely on ambiguous language from the "preamble" to contradict the plain language of the rule itself. This would be particularly inappropriate since earlier versions of the rule made specific reference to

---

A number of commentators questioned when the fourth step of the hierarchy in the proposed CAS 418, a base representative of the activity being managed or supervised, was to be used. The Standard has been revised to provide more clearly that this type of base is to be used only to allocate indirect cost pools containing significant amounts of the costs of management or supervision of activities involving direct labor or direct material cost, which are direct costs as defined by the Board. Therefore these cost pools are those which include the costs of managing and supervising final cost objectives or other cost objectives which are accounted for in a similar manner (those listed in § 418.50(d)(3)). A base representative of the activity being managed or supervised is not suitable for the allocation of the costs of management or supervision of activities involving only indirect costs.

For emphasis, the fourth step of the hierarchy has been set forth in a paragraph, § 418.50(d), separate and apart from the first three steps of the hierarchy (§ 418.5(e)) which should be used for allocating other indirect cost pools such as service centers.

45 Fed. Reg. 31931.

"overhead costs" and "service center costs," 43 Fed. Reg. 11120–24, terminology that was rejected in adopting the final rule.[9] *See In re Beineke*, 690 F.3d 1344, 1351–52 (Fed. Cir. 2012).

The second question here is whether "material amount" refers to comparing the amount of the costs of supervision or management in the pool to 1) the total amount of the pool or 2) the total amount of supervision or management costs. The government argues for the second, contending that Sikorsky's pool contains a material amount of those costs because it contains all of Sikorsky's costs of management and supervision of activities in the pool. Sikorsky argues for the first construction, arguing that the relevant inquiry is whether the costs of management or supervision are a material part of the pool as a whole, not whether a given pool contains all of the related management or supervision costs.

We agree with Sikorsky that the proper inquiry is whether the costs of supervision and management comprised a material amount of the material overhead pool at issue. The language of CAS 418-40(c) makes this clear. CAS 418-40(c)(1) applies where management and super-

---

[9] The government also relies on a transcript of a meeting of the CASB approximately two weeks before the promulgation of the CAS, but the transcript is not an official document.

This is not a case in which the term is ambiguous, and the government relies on unpublished *interpretations* of the regulation. We need not decide whether such an unpublished agency interpretation would be entitled to *Auer* deference. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 283–84 (2009). In arguing for its construction of CAS 418, the government does not rely on any agency interpretations construing the rule.

vision costs are "a material amount of the costs included in a cost pool." 48 C.F.R. § 9904.418-40(c)(1). CAS 418-40(c)(1) specifically states that the key issue is the materiality of the costs of management or supervision activities with respect to the cost pool as a whole.

The next question is whether the costs of management and supervision here were a material amount of Sikorsky's materiel overhead pool.[10] The government

---

[10] The CAS provide six criteria for determining "whether amounts of cost are material or immaterial," with "no one criterion . . . necessarily determinative." 48 C.F.R. § 9903.305. The factors are:

(a) The absolute dollar amount involved. The larger the dollar amount, the more likely that it will be material.

(b) The amount of contract cost compared with the amount under consideration. The larger the proportion of the amount under consideration to contract cost, the more likely it is to be material.

(c) The relationship between a cost item and a cost objective. Direct cost items, especially if the amounts re themselves part of a base for allocation of indirect costs, will normally have more impact than the same amount of indirect costs.

(d) The impact on government funding. Changes in accounting treatment will have more impact if they influence the distribution of costs between Government and non-Government cost objectives than if all cost objectives have Government financial support.

argues that "material" means more than a de minimis amount. We agree with the Claims Court that "material" refers to a significant amount. Sikorsky argues that, applying the correct standard for materiality, managers and supervisors comprised seven percent of the materiel logistics workforce and fourteen percent of the purchasing group staff, and that the costs of management and supervision were not a material amount. The government does not argue that these costs of management and supervision were a significant portion of Sikorsky's total pool, or that other factors should be used in considering materiality. Therefore, we affirm the finding of the Claims Court that the costs of management and supervision were not a material amount of the total pool costs.

The fourth question is whether Sikorsky's pool is outside of subsection (e) because it fails to satisfy the homogeneity requirement. CAS 418-40(b) provides that, as a "fundamental requirement[]," "[i]ndirect costs shall be accumulated in indirect cost pools which are homogeneous." 48 C.F.R. § 9904.418-40(b). CAS 418-50(b) states that "[a]n indirect cost pool is homogeneous if each signif-

---

(e) The cumulative impact of individually immaterial items. It is appropriate to consider whether such impacts:

(1) Tend to offset one another, or

(2) Tend to be in the same direction and hence to accumulate into a material amount.

(f) The cost of administrative processing of the price adjustment modification shall be considered. If the cost to process exceeds the amount to be recovered, it is less likely the amount will be material.

*Id.*

icant activity whose costs are included therein has the same or a similar beneficial or causal relationship to cost objectives as the other activities whose costs are included in the cost pool." *Id.* § 9904.418-50(b). CAS 418-50(e) states that "[h]omogeneous indirect cost pools of th[e] type" not having material amounts of the costs of management or supervision "have a direct and definite relationship between the activities in the pool and benefiting cost objectives." *Id.* § 9904.418-50(e).

The government argues that Sikorsky's indirect cost pool is not homogeneous because it contains both manufacturing overhead costs and materiel overhead costs. But a pool is still homogeneous if "the allocation of the costs of the activities included in the cost pool result in an allocation to cost objectives which is not materially different from the allocation that would result if the costs of the activities were allocated separately." *Id.* § 9904.418-50(b). We agree with Sikorsky and the Claims Court that the government failed to establish that any material difference in allocation results from Sikorsky's combination of manufacturing and materiel overhead costs. Where both types of costs in the pool, materiel overhead and manufacturing overhead, are allocated according to the same base, it does not matter whether the costs are combined into one pool or separated into separate pools. The end allocation is identical. Because there would be no material difference in the allocation, the homogeneity requirement is satisfied.

The final question is whether, if subsection (e) applies, the government has shown that Sikorsky failed to comply with CAS 418(e) by using a direct labor base. The parties agree that CAS 418(e)(3) applies if subsection (e) is applicable, as we hold that it is. CAS 418(e)(3) provides that "a surrogate that varies in proportion to the services received shall be used to measure the resources consumed. Generally, such surrogates measure the activity of the cost objectives receiving the service." 48 C.F.R.

9904.418-50(e)(3). It is worth noting that CAS 418-50(e) requires that an "appropriate measure of resource consumption" be applied, rather than the best measure of resource consumption. *Id.* § 9904.418-50(e).[11]

Sikorsky argues that a direct labor base was appropriate because, historically, there was a correlation between direct labor and materiel overhead. Year to year, the materiel overhead and direct overhead varied in rough proportion, although this relationship was not exact, and in one year the direct labor costs increased while materiel overhead costs decreased. We have some doubt that an allocation based on direct labor satisfies the proportionality requirement simply because of a year-by-year correlation between labor hours and materiel overhead. But despite our invitation to do so at oral argument, the government has been unwilling or unable to argue that Sikorsky's approach is not appropriate. Under the circumstances, we decline to address that argument.

Finally, we note that the government argues that dire adverse consequences will flow from our rejection of the government's interpretation of the CAS. But if that is the case, revision of the CAS standards by the CASB is the appropriate remedy. As we said in *Rumsfeld*, "[o]ur task . . . is to interpret CAS, not to rewrite it to provide an equitable result." *Rumsfeld*, 315 F.3d at 1377.

In summary, we hold that subsection (e) governs and that the government has not shown that Sikorsky has

---

[11]   The "preamble" to the CAS specifically noted that the CASB substituted the phrase "an appropriate measure of resource consumption" for the phrase "best available representation of resource consumption" used in a previous proposed version of CAS 418-50(e). 45 Fed. Reg. 31931.

adopted an inappropriate measure of resource consumption.

## APPEAL NO. 2013-5096 AFFIRMED

## APPEAL NO. 2013-5099 DISMISSED

Costs

Costs to appellee.