ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Afghan Premier Logistics | )     ASBCA Nos. 62938, 62939, 62940 |
| | ) |
| Under Contract No. W91B4N-11-D-7003 | ) |

APPEARANCE FOR THE APPELLANT:     Michael D. Maloney, Esq.
       Williams Mullen
       Tysons Corner, VA

APPEARANCES FOR THE GOVERNMENT:     Scott N. Flesch, Esq.
       Army Chief Trial Attorney
      Zachary F. Jacobson, Esq.
      MAJ Aaron McCartney, JA
      James D. Stephens, Esq.
      MAJ Jill B. Wiley, JA
      LT Bryan R. Williamson, JA
       Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE WILSON
ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

These appeals involve a contract for Afghan Premier Logistics (APL) to provide the Department of the Army, Combined Joint Theater Support Contracting Command (Army) commercial transportation services under the National Afghan Trucking (NAT) program. The Army moves for summary judgment, arguing that APL failed to file these claims within six years as required by § 7103(a)(4)(A) of the Contract Disputes Act (CDA) and that the claims are barred by APL's signed release of claims. APL argues it filed its claims within six years of accrual, and alleges that there are factual questions as to whether the release was induced by misrepresentation and fraud on the part of the Army, whether the Army waived the requirement of a release or exchanged consideration for the release, and whether the Army intended the release to bar all future claims. For the reasons stated below, we grant the Army's motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On August 12, 2011, the Army awarded Contract No. W91B4N-11-D-7003-P00008 (the contract) to APL to provide trucking services throughout Afghanistan (R4, tab 1 at 1-7). The contract is one of 20 similar contracts awarded to Afghan trucking contractors to provide ground transportation services under the scope of the NAT program (gov't mot. at 2).

2.  The contract included a 12-month base period from September 16, 2011 to September 15, 2012, one 12-month option period from September 16, 2012 to September 15, 2013, and one three-month option period from September 16, 2013 to December 15, 2013 (R4, tab 1 at 14).

3.  The contract incorporated an order of merit list (OML) process to provide all awardees a fair opportunity to compete with each other for task orders under the contract (R4, tab 1 at 40).  The contract explained the OML process in detail and provided contractors with an appeal process to the designated Central Command (CENTCOM) Contracting Command task order ombudsman for resolution of weekly evaluation results and suspensions (*id*. at 40-48).

4.  On August 16, 2011, the Army's contracting officer (CO) issued Task Order No. 0001 to APL for trucking services under the contract, with a performance period of September 15, 2011 to November 30, 2011 (R4, tab 2).

5.  On December 1, 2011, the CO issued Task Order No. 0002 to APL for trucking services under the contract, with a performance period of December 1, 2011 to September 15, 2012 (R4, tab 7 at 1-4).

6.  On December 1, 2011, the CO issued Task Order No. 0003 to APL for trucking services under the contract, with a performance period of December 1, 2011 to September 30, 2012 (R4, tab 8 at 1-4).

7.  On September 16, 2012, the CO issued Task Order No. 0004 to APL (R4, tab 50 at 1).  The purpose of this task order was to provide funding in support of Option Period 1 of the contract, which ran from September 16, 2012 to September 15, 2013 (*id*. at 3).

8.  On September 7, 2013, the CO issued Task Order No. 0005 to APL (R4, tab 137 at 1).  The purpose of this task order was to provide funding in support of the contract's Option Period 2, which ran from September 16, 2013 to December 15, 2013 (*id*. at 3-5).

9.  On December 16, 2013, the CO issued Task Order No. 0006 to APL (R4, tab 145 at 1).  The purpose of this task order was to provide funding to support an additional six-month option to extend performance under the contract from December 16, 2013 to June 15, 2014 (*id*. at 5).

10.  Over the course of the contract, APL's program manager, Mr. James Bivens, regularly disputed deductions on invoices returned from the Army.  Emails exchanged between Mr. Bivens and Army contracting personnel demonstrate that APL

2

routinely disputed deductions on the invoices on an approximately monthly basis upon notification of the deductions. (R4, tabs 32, 37, 38, 43, 47, 54, 54a-c, 61, 73)

11. On September 5, 2014, Mr. Bivens sent an email to the CO thanking her for meeting with APL and informing her that APL had closed out all of the contract's task orders and would not be submitting any more additional documents to the Army for claims. This email included a list of APL's outstanding claims with the CO's office and the Army's Contracting Officer Representative at the time. Mr. Bivens informed the CO that he would immediately sign the Army's releases for Task Orders 0001, 0003, 0004, 0005, and 0006 after receiving a contracting officer's final decision (COFD) on each of these claims. In return, Mr. Bivens asked for a letter from the CO containing the following release "or something to this effect:"

> RELEASE OF CLAIMS / Closure of Contractual Agreement
>
> In consideration of the premises contained herein, the United States Government (USG) hereby remises, releases, mutually agrees, and forever discharges Afghanistan Premier Logistics (APL), its officers, agents, and employees, of and from all manner of debts, dues, liabilities, obligations, accounts, claims, adjustments, and demands whatsoever, in law and in equity, under the National Afghan Trucking contract, W91B4N-11-D-7003, and its associated Task Orders, 0001, 0003, 0004, 0005, and 0006.

(R4, tab 171)

12. As part of the closeout process, the contracting officials set a deadline of September 15, 2014, for submittal of claims to the contracting office. By email dated September 29, 2014, Mr. Bivens informed the CO that APL had no further claims to submit but that it still had five outstanding claims with the contracting office. Once again, Mr. Bivens stated that he would sign release forms for Task Orders 0001, 0003, 0004, 0005, and 0006 upon receiving COFDs for these claims. (R4, tab 177)

13. On October 16, 2014, the CO submitted a release of claims memorandum to APL. The memorandum stated:

> Our records show that the task order listed above has been completely invoiced for the services rendered.

3

Please check your records to ensure that all invoices are paid and that there are no outstanding charges pending. An authorized signature at the bottom of this page is required in order for us to complete the process of closing out this file. Please scan and return this document via email. If you have not contacted our office by the suspense date noted above [November 1, 2014], we will conclude that our records are accurate and we will proceed with closeout procedures.

(R4, tab 181)

14. On October 17, 2014, Mr. Bivens signed his name and acknowledged his title as program manager at the bottom of the memorandum, and affixed his personal stamp to the document. Mr. Bivens' signature appeared under the following statement:

I hereby certify that the subject contract is paid in full. The undersigned contractor hereby releases the United States Government, its officers, agents and employees of and from all liabilities, obligations, claims, appeals and demands which it now has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable arising under or in any way related to the services provided.

(R4, tab 181). The record does not contain any evidence of multiple communications between the parties prior from September 2014 to October 28, 2020.

15. On October 28, 2020, APL submitted a certified claim to the CO requesting $6,407,864.16 plus interest for failure to make payments due to APL "(1) for services performed and accepted under the Contract; and (2) for missions the Army cancelled either within 24 hours before or any time after APL's trucking asset had already reached the origin point on the Required Spot Date ('RSD')" (R4, tab 191 at 1-2).

16. On October 28, 2020, APL submitted a second certified claim to the CO requesting $5,768,374 plus interest for unpaid demurrage payments (R4, tab 192 at 1).

17. On November 10, 2020, APL submitted a third certified claim to the CO requesting $4,789,937 plus interest "for the Government's constructive change in the scope of certain [transportation movement requests (TMRs)] under the Dry and Heavy Suites of the Contract by increasing the amount of in-transit time to complete the missions beyond the time specified in the TMRs" (R4, tab 193 at 1).

4

18. In a footnote to each of these certified claims, APL included the following statement:

> This claim is timely because it is being submitted within six years after the claim accrued or, alternatively, the six year CDA limitations period was tolled during all times the Army was considering "disputes" under the process set up under the Contract and as specified in a Memorandum from the Contracting Officer, identified as NAT 0464. In addition, the Army's Contracting Officers and other personnel (acting with the Contracting Officers' authorization and approval) made statements to force APL to delay submission of claims solely to accommodate the Army. And those statements had their desired effect. The result is that the six-year period was tolled during all such times when the Army would not accept claims from APL (and other NAT contractors).

(R4, tabs 191 at 6 n.2; 192 at 3 n.2; 193 at 4 n.4). An additional footnote found within the October 28, 2020 claim stated further:

> The Army's disputes process under the NAT contract is detailed in NAT 0464, dated 13 March 2013, entitled, "Memorandum to NAT Carriers." Under that disputes process, among other things, the Army described for carriers how disputes should be presented to the Army and stated that NAT contractors were permitted to dispute decisions relating to payment for TMRs multiple times. In practice, the Army allowed NAT contractors to submit disputed TMRs for payment multiple times after an earlier dispute was rejected. And the Army regularly reversed its earlier denials and made payments after contractors provided additional information in second and third rounds of disputes.

(R4, tab 191 at 14 n.6). The above-referenced "Memorandum to NAT Carriers" is not contained in the record of these appeals.

19. On March 18, 2021, the CO issued COFDs denying both of APL's October 28, 2020 claims and its November 10, 2020 claim in full (R4, tabs 197-199).

20.  On May 28, 2021, APL timely appealed all three COFDs to the Board, which were docketed as ASBCA Nos. 62938, 62939, and 62940 respectively.

DECISION

The Army argues that APL's claims are barred because they were not filed within six years of accrual as required by § 7103(a)(4)(A) of the CDA and because APL agreed to a release of claims that covers the subject of these appeals (gov't mot. at 8; gov't reply at 10).  APL contends that there are issues of fact as to when the claims accrued, whether the Army waived the requirement of a release or exchanged consideration for the release, whether the release was induced by fraud or misrepresentation on the part of the Army, and whether the Army intended the release to serve as a complete bar to future claims (app. resp. at 1-3, 14-17).

I.  *Standard of Review*

Summary judgment is proper when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  A fact is material if it may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  The movant bears the burden of establishing the absence of any genuine issue of material fact.  *Celotex*, 477 U.S. at 322.  Regardless of the type of claim being raised, the applicable substantive law determines which facts are material and thus preclude an entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.  Such facts must be viewed in the light most favorable to the non-moving party.  *Id*. at 255; *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993).  However, the non-movant must set forth specific facts demonstrating the existence of a genuine issue of material fact; mere conclusory statements and bare assertions are inadequate.  *Mingus*, 812 F.2d at 1390-91; *Liberty Lobby*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient . . . .").  Our responsibility is not "'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial."  *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Liberty Lobby*, 477 U.S. at 249).

II.  *APL Failed to File its Claim Within Six Years*

The CDA requires that "[e]ach claim by a contractor against the Federal Government relating to a contract and each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim."  41 U.S.C. § 7103(a)(4)(A).  The Federal Acquisition Regulation (FAR) further provides that "[c]ontractor claims shall be submitted, in writing, to the

6

contracting officer for a decision within 6 years after accrual of a claim, unless the contracting parties agreed to a shorter time period." FAR 33.206(a). "Whether and when a claim has accrued is determined according to [the FAR], the language of the contract, and the facts of the particular case." *Electric Boat Corp. v. Sec'y of the Navy*, 958 F.3d 1372, 1375 (Fed. Cir. 2020); *see also Kellogg Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016). The FAR defines "accrual of a claim" as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." FAR 33.201. In order for liability to be fixed, some injury must have occurred to the party making the claim; however, monetary damages need not have been incurred. *Id*.; *Electric Boat*, 958 F.3d at 1375-76.

In order to determine when a claim has accrued, the Board must first examine the legal basis of the claim. *New Iraq Ahd Co.*, ASBCA Nos. 58763, 59286, 14-1 BCA ¶ 35,781 at 175,037. In the case at hand, the legal bases of APL's October 28, 2020 claims are unpaid demurrage payments, the Army's alleged failure to pay APL for services provided under the contract, and its alleged failure to pay APL for missions cancelled within 24 hours of or after the time APL had reached the origin point on the RSD (SOF ¶¶ 15-16). The basis for APL's November 10, 2020 claim is that APL was allegedly due payment for the Army's constructive change to the scope of certain TMRs under the Dry and Heavy Suites of the contract (SOF ¶ 17).

Next, the Board must determine when the claims accrued by assessing when APL knew or should have known of these legal bases. *Gray Personnel, Inc.*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,476. "Once a party is on notice that it has a potential claim, the statute of limitations can start to run." *Id*. A contractor is "not required to incur actual costs" in order for a claim to accrue. *Electric Boat*, 958 F.3d at 1377. Rather, a claim accrues when the contractor is capable of knowing that its cost of performance will be affected. *BNN Logistics*, ASBCA Nos. 61841 *et al*., 21-1 BCA ¶ 37,912 at 184,125. "The events fixing liability should have been known when they occurred unless they can be reasonably found to have been either concealed or 'inherently unknowable' at that time." *Id*. (citing *Raytheon Missile Sys.*, ASBCA No. 58011, 13-1 BCA ¶ 35,241 at 173,018).

In *Electric Boat*, the contractor filed a certified claim against the Navy seeking a price adjustment for increased costs it allegedly incurred due to its compliance with an Occupational Safety and Health Administration (OSHA) regulation that was enacted after performance had already begun under the contract. *Electric Boat*, 958 F.3d at 1375. The Federal Circuit held that the contractor's claim accrued—and the Navy's liability became fixed—on the date that the contract first provided the contractor a right to a price adjustment after the OSHA regulation was enacted and not, as the contractor argued, when the Navy's CO denied its request for a price adjustment. *Id*. at 1376.

7

In *BNN*, like the case at hand, the contractor was awarded a NAT contract to provide the Army trucking services in Afghanistan. *BNN*, 21-1 BCA ¶ 37,912 at 184,122. The contractor filed several claims against the Army to recover refunds of deductions that it alleged were improperly taken from invoices under the contract. *Id*. at 184,124. The Board held that the contractor's injury was the reduction of the proportion of the invoices to which the contractor was entitled, and therefore its claim accrued when it received the invoices instituting these deductions, and not at the time of payment as the contractor argued. *Id*. at 184,127.

Here, APL's October 28, 2020 claims accrued when it knew or should have known of the reductions in pay on which the claims are based—the date APL received the returned invoices indicating these reductions (SOF ¶¶ 15, 16). *Id*. Likewise, APL's November 10, 2020 claim accrued when it received notice that the Army was increasing the amount of in-transit time to complete the missions beyond the time specified in the TMRs (SOF ¶ 17). *See id*. This would have occurred during the life of the contract, more than six years prior to the filing of its claims. On October 16, 2014, the Army issued a release of claims memorandum to APL. This memorandum included the following language:

> *Our records show that the task order listed above has been completely invoiced for the services rendered.*
>
> Please check your records to ensure that all invoices are paid and that there are no outstanding charges pending. An authorized signature at the bottom of this page is required in order for us to complete the process of closing out this file. Please scan and return this document via email. If you have not contacted our office by the suspense date noted above [November 1, 2014], we will conclude that our records are accurate and we will proceed with closeout procedures.

(SOF ¶ 13) (emphasis added) On October 17, 2014, Mr. Bevins signed the memorandum under the following statement:

> *I hereby certify that the subject contract is paid in full.* The undersigned contractor hereby releases the United States Government, its officers, agents and employees of and from all liabilities, obligations, claims, appeals and demands which it now has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable arising under or in any way related to the services provided.

8

(SOF ¶ 14) (emphasis added)  It is therefore undisputed that at this time, APL had acknowledged receipt of all invoices, which included all the reductions taken by the Army under the contract, and therefore knew or should have known of the bases of its claims *before* Mr. Bevins signed the release on October 17, 2014 (*see* gov't mot. at 13-17).  Since APL's claims were filed on October 28, 2020 and November 10, 2020—more than six years later—they are thus barred by the CDA.  41 U.S.C. § 7103(a)(4)(A).

APL argues that there are questions of fact as to whether the Army concealed information that gave rise to its claims (app. resp. at 4-5).  Specifically, APL points to the Army's use of GPS data to determine whether APL met various requirements under the contract (*id*. at 5).  On March 30, 2014, the Army changed its contract with its GPS provider, which loosened the software's fidelity requirement to one square mile (*id*.).  APL contends that because of this change, every decision by the Army to deduct its payments to APL based on the alleged impreciseness of this GPS data poses questions of fact as to whether the Army breached both the contract and the implied covenant of good faith and fair dealing (*id*.).  Furthermore, APL asserts that the fact that this information was concealed by the Army made its claims "inherently unknowable," and thus should have suspended the accrual of its claims (*id*.).  However, APL presents no factual evidence supporting these statements or the allegation that the Army concealed any of this information.  These mere conclusory statements and bare assertions alone are insufficient to demonstrate any genuine issue of material fact.  *Mingus*, 812 F.2d at 1390-91; *Liberty Lobby*, 477 U.S. at 252.

### III.  *APL's Signed Release of Claims*

The Army additionally argues that APL's claims are barred by its signed release of claims (gov't mot. at 12-15; gov't reply at 17-21).  APL alleges that (1) the release was fraudulently induced (app. resp. at 7-14), (2) there are material factual disputes about whether the Army waived the requirement of a release or exchanged consideration for the release (*id*. at 14-17), and (3) there are factual issues about whether the Army understood the release to serve as a complete bar to future claims (*id*. at 18-19).  However, as discussed above, since APL's claims were not filed within six years of accrual, we need not discuss the effect of the release of claims.  Moreover, further discovery will not produce relevant information that will change that fact.

### IV.  *The Statute Was Not Equitably Tolled*

The CDA's statute of limitations is not jurisdictional, and is subject to equitable tolling.  *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1322 (Fed. Cir. 2014).  The Board has held that the CDA's six-year statute of limitations "may be equitably tolled when a litigant has (1) been pursuing his rights diligently, and (2) some

9

extraordinary circumstance 'stood in his way and prevented timely filing.'" *The Adamant Grp. for Contracting and Gen. Trading*, ASBCA No. 60316, 16-1 BCA ¶ 36,577 at 178,136 (citing *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016)); *see also Kamaludin Slyman CSC*, ASBCA No. 62006 *et al.*, 21-1 BCA ¶ 37,849 at 183,794.

Here, the record shows that there was no communication between the parties for more than six years (SOF ¶14), and therefore APL has failed to offer any evidence that it was pursuing its rights diligently. Moreover, due to the lack of evidence, APL cannot show that some extraordinary circumstance prevented it from timely filing its claims with the contracting officer. Accordingly, tolling the statute of limitations is not legally tenable.

APL additionally contends that the Army's alleged concealment of the GPS data's impreciseness suspends the accrual of its claims (app. resp. at 5-6). Under the accrual suspension rule, "the accrual of a claim against the United States is suspended . . . until the claimant knew or should have known that the claim existed.'" *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003). In order to achieve such a suspension, the claimant must demonstrate that either the United States concealed information necessary for the claimant to understand that it had a claim or that the claimant's injury was "inherently unknowable" at the time of accrual. *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008); *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985). However, APL's alleged injury was not "inherently unknowable" at the time its claims accrued. *BNN*, 21-1 BCA ¶ 37,912 at 184,125 (SOF ¶¶ 10, 13-14). Furthermore, as discussed above, APL has not presented any factual evidence supporting the proposition that the Army concealed information about the preciseness of the GPS data. *See Young*, 529 F.3d at 1385.

Because the Army has demonstrated that APL's claims accrued more than six years before they were filed, the claims are barred by § 7103(a)(4)(A) of the CDA. There being no issues of material fact, the Army is entitled to judgment as a matter of law.

CONCLUSION

The appeals are denied.

Dated: February 24, 2022

_____
OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

_____
RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

_____
LAURA J. EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62938, 62939, 62940, Appeals of Afghan Premier Logistics, rendered in conformance with the Board's Charter.

Dated: February 24, 2022

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

11