ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| Kellogg Brown & Root Services, Inc. | ) ASBCA Nos. 58518, 59005 |
| | ) |
| Under Contract Nos. DAAA09-02-D-0007 *et al.* | ) |

APPEARANCES FOR THE APPELLANT:      Jason N. Workmaster, Esq.
                                     Patrick J. Stanton, Esq.
                                         Covington & Burling LLP
                                       Washington, DC

APPEARANCES FOR THE GOVERNMENT:      E. Michael Chiaparas, Esq.
                                       DCMA Chief Trial Attorney
                                       Douglas R. Jacobson, Esq.
                                       Trial Attorney
                                       Defense Contract Management Agency
                                     Bloomington, MN

## OPINION BY ADMINISTRATIVE JUDGE PAGE
## ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Kellogg Brown & Root Services, Inc. (KBRSI, appellant or the contractor) appeals from two contracting officers' final decisions (COFDs) by the divisional administrative contracting officer (DACO) of the Defense Contract Management Agency (DCMA). The COFD of 14 August 2012 asserted that the contractor did not properly allocate certain risk management insurance costs in compliance with Federal Cost Accounting Standards (CAS) (R4, tab 14), and the COFD of 29 October 2012 demanded repayment of $8,838,619 in alleged overcharges (R4, tab 19). These COFDs address a number of government[1] contracts between the government and KBRSI,[2] during 2006; the parties

---

[1]  KBRSI contracted with the Army (R4, tab 1 at 1). The contracting officer was employed by DCMA, and the audits were performed by DCAA. We refer to the Army and DCMA as "the government" and to DCAA by its acronym.

[2]  Appellant advised that "the entities and the names of the entities have varied over time as a result of organizational changes" (app. mot. at 6 n.8). It explains that KBRSI "currently holds the contracts that are the subject" of these appeals (compl. ¶ 8). KBRSI is a business segment of Kellogg Brown & Root (KBR) (app. mot. at 5, app'x B, declaration dated 21 February 2014 of Charlie Kerr, senior manager of Kellogg, Brown & Root LLC (formerly KBRSI prior to 30 June 2006) (Kerr decl.), ¶ 5) and

have stipulated Contract No. DAAA09-02-D-0007 as the representative contract for purposes of these appeals.[3]

Initially, appellant filed a "motion for judgment" without specifying whether it was a motion to dismiss or a motion for summary judgment (app. mot. at 2). That motion was predicated upon the alleged untimeliness of the government's affirmative claims; KBRSI maintained the government knew or should have known that its claims accrued more than six years before the COFDs were issued and are in violation of the Contract Disputes Act (CDA), 41 U.S.C. § 7103 (app. mot. at 2-3). After the United States Court of Appeals for the Federal Circuit rendered its decision in *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315 (Fed. Cir. 2014) (*Sikorsky*), the Board conducted an oral argument on the impact of that decision on this appeal, and allowed supplemental briefing. Despite its continuing disagreement with that opinion, appellant states that "KBRSI's motion now is one for summary judgment under ASBCA Rule 7(c)" (app. supp. br. at 4). The contractor's motion has been extensively briefed.[4]

For reasons stated below, we deny the motion.

---

Halliburton is the corporate home office (app. mot. at 5). On 5 April 2007, "Halliburton separated into two public companies – Halliburton and KBR," and that since the same date, "KBRSI has been a subsidiary of KBR" (compl. ¶¶ 11-12). We note that documents in the record occasionally refer to Energy Services Group (ESG), another business segment of Halliburton. For purposes of this motion only, references to KBR and KBRSI both refer to the contractor.

[3] The Board has recognized that a single DCAA audit or agency COFD may encompass multiple contracts, and has held that it is sufficient for purposes of determining jurisdiction that the parties designate a representative contract. *See, e.g., Leidos, Inc., f/k/a Science Applications International Corp.*, ASBCA No. 59076, 14-1 BCA ¶ 35,621; and *The Boeing Company*, ASBCA No. 58587, 14-1 BCA ¶ 35,470. In the instant appeals, neither COFD specifies the affected contracts. For purposes of ruling on the motion before us, we accept the parties' 15 April 2015 stipulation as to the affected contracts but note that the current record contains only excerpts from Contract No. DAAA09-02-D-0007 (R4, tab 1), which the parties identify as the LOGCAP III contract. For ease of reference, we cite this contract number in captioning the decision.

[4] We refer to the motion and briefs as follows: appellant's motion for summary judgment (app. mot.); government's opposition to appellant's motion (gov't opp'n); appellant's reply to the government's opposition (app. reply br.); appellant's brief in response to oral argument (app. resp.); government's brief in response to oral argument (gov't resp.); government's supplemental briefing on *Sikorsky* (gov't supp. br.); appellant's supplemental briefing on *Sikorsky* (app. supp. br.); and appellant's reply to the government's supplemental briefing on *Sikorsky* (app. supp. reply).

2

<u>STATEMENT OF FACTS FOR PURPOSES OF THE MOTION</u>

In 2006, Brown and Root Services, a division of Kellogg Brown & Root, Inc. (KBR), was performing a number of contracts for the United States Government and providing a broad range of services. For example, KBR held the following major contracts: (1) the Balkans Support Contracts (BSC), under which KBR provided logistical and life-support services to the Army in the Balkans region; (2) the Logistics Civil Augmentation Program (LOGCAP) III contract, under which KBR provided logistical and life-support services to the Army that included but were not limited to: dining facility services, transportation, billeting, waste disposal, water and ice production and delivery, laundry, fuel delivery, and morale, welfare, and recreation services; and (3) the Restore Iraqi Oil (RIO) contract, under which KBR provided services related to the restoration of the Iraqi Oil infrastructure. (*See* compl. ¶ 21; answer ¶ 21; R4,[5] tab 1) The government awarded Contract No. DAAA09-02-D-0007, the LOGCAP III contract, on 14 December 2001 (R4, tab 1 at 1) and the RIO contract on 8 March 2003. Many of the contracts and orders which KBR was performing in 2006 were cost-reimbursement or time-and-materials contracts (app. mot. at 1; gov't opp'n[6] at 1).

The applicable contracts contain Federal Acquisition Regulation (FAR) 52.230-2, COST ACCOUNTING STANDARDS (APR 1998) (app. mot. at 4-5; gov't opp'n at 1; *see, e.g.*, R4, tab 1 at 3).

Prior to and during 2006, KBR divided its insurance coverage into a "Primary" program and an "Excess Liability [EL]" program. The Primary program consisted of the primary layer of self-insurance for Worker's Compensation (WC), Auto Liability (AL), and General Liability (GL) (app. mot. at 5; gov't opp'n at 1). The EL program, also referred to as the "General Insurance" program, consisted of a share of annual insurance policy premiums, purchased fronting policies for WC, AL and GL, and insurance administration expenses, such as the insurance or risk management department operation costs, broker service fees, the cost of claims processing, and actuarial fees (app. mot. at 5, Kerr decl. ¶¶ 1, 14; gov't opp'n at 1).[7]

Also prior to and during 2006, KBR had three levels of allocation under CAS for its EL program: (1) from corporate home office (Halliburton) to intermediate home office; (2) from intermediate home office to segments; and (3) from segments to cost

---

[5] In referring to the Rule 4 file, we rely upon page numbers affixed by the parties unless the document is already paginated.

[6] Because the government failed to affix page numbers to its brief in opposition to appellant's motion, the Board has done so to allow ready reference.

[7] In its reply brief, KBRSI provided a second declaration from Charlie Kerr dated 2 June 2014 (app. reply br., app'x B (Kerr supp. decl.)).

objectives (app. mot. at 5-6; gov't opp'n at 1; *see also* CAS 402 (definition of "cost objective") and CAS 403 (definitions of "home office" and "segment"). In the same period, KBR had two levels of allocation under CAS for its Primary program. The first was from intermediate home office to segments, and the second from segments to cost objectives. (App. mot. at 6; gov't opp'n at 1)

An email from Floyd Green of Halliburton dated 27 February 2004 to Alan Burningham of DCAA forwarded the contractor's "2001-2003 Rate Development" schedule (2001-2003 Plan) for WC, GL, and AL. The information is provided in tabular, not narrative, form. (R4, tab 40)

By email transmitted 8 June 2004, KBR disclosed a change to the allocation basis for its EL program costs to segments from payroll to revenue for 2004 and 2005 ("2004 Plan: Burden & benefit rate support"). This information is in tabular form. (R4, tab 41) DCMA issued a Contractor Insurance Pension Review (CIPR) for FYs 2001 and 2002 on 29 July 2004 (R4, tab 43). Also on 29 July 2004, DCMA provided its "Forward Pricing Rate Recommendation (FPRR) for [FYs 2003-2008], Brown and Root Services Operations, Kellogg Brown" (R4, tab 44).

A 23 November 2005 letter from Todd W. Bishop of KBR to Jerry Conry, DCMA, transmitted KBRSI's "[FPRR] PROPOSAL 2006 PLAN [THAT] INCLUDES: HOME OFFICE ALLOCATION PROCUREMENT SERVICE CENTER" (2006 Plan) (R4, tab 45).

On 24 February 2006, KBRSI submitted "Revision 2-2005" in response to DCMA's request for additional information concerning "potential inadequacies" noted by DCAA (R4, tab 46). Item C2 "Description of Line of Insurance Coverage: Excess Liability" included the statement "These costs are, in effect, allocated to the various units in the group by collecting a general insurance charge, which is internally assessed against the payrolls of the respective business units" (*id.* at 299).

Halliburton allocated insurance administration expenses to KBR based on a Transition Services Agreement (TSA) (app. mot. at 7 n.11; gov't opp'n at 1). On 27 July 2006, KBR provided TSA information pertaining to allocation of risk management expenses to DCAA (R4, tab 53). The TSA provided a table for "RISK MANAGEMENT" showing salaries, "Burdens @ 33%," and other costs with a bottom line "Risk Mgmt KBR TSA PER MONTH" of $100,536.08 (*id.* at 346).

Throughout 2006, KBR regularly submitted invoices under its cost-reimbursement and time-and-materials contracts to the government on a twice-monthly basis. The invoices, which included portions of KBR's insurance costs and related expenses allocated according to KBR's practices, were regularly paid by the government. (App. mot. at 8-9, appendix A "Examples of KBR's Disclosures and the Government's Review

4

of KBR's Allocation Practices Prior to October 29, 2006" (app'x A); Kerr decl. ¶¶ 42-44; gov't opp'n at 2)

On 16 January 2006, KBR submitted its first invoice under Contract No. DAAA09-02-D-0007, a cost-reimbursement contract. The invoice included insurance costs and related expenses. The government paid KBR based on this invoice on 24 January 2006. (R4, tab 49; app. mot. at 9; Kerr decl. ¶ 45; gov't opp'n at 2)

KBRSI provided DCMA with its Burdens & Benefits (B&B) proposal based upon the 2006 Plan on 20 April 2006 (R4, tab 20). This information included a table captioned as a "BURDEN SUMMARY – EXCESS INSURANCE FOR 2006 RATE DEVELOPMENT" for KBR, with a column for "2006 Plan Payroll" (*id.* at 38).

On 27 April 2006, DCMA requested that the DCAA audit "KBRSI['s] [B&B] Rates Proposal for Fiscal Year 2006 Plan." DCMA requested that the audit be completed on or before 30 May 2006. (R4, tab 27; app. mot. at 9; gov't opp'n at 2)

DCAA reviewed the contractor's B&B rate proposal and requested additional information pertaining to the proposal and the costs it covered. KBR was asked to provide the information by 21 June 2006. (R4, tab 47; app. mot. at 9; gov't opp'n at 2) KBR's Charlie Kerr replied on 22 June 2006, and noted that additional information was being assimilated for certain years and would be provided. An attachment to Kerr's email listed information furnished for the 2006 audit. (R4, tab 31) On 5 July 2006, KBR further responded to the government's questions and advised that additional documentation would be provided (R4, tab 48) (app. mot. at 9; gov't opp'n at 2).

In an email of 27 July 2006 (R4, tab 53), Kerr forwarded to DCAA's Julian Brown a document described as "the backup and basis of estimate for the TSA portion of RM Accounting overhead" (*id.* at 343), that included a table labeled "KBR TRANSACTION SERVICE AGREEMENT" (*id.* at 346).

On 31 August 2006, DCAA notified Kerr that it questioned KBR's allocation methods for certain insurance costs and related expenses as noncompliant with several CAS provisions. These included CAS 401 "Consistency in Estimating, Accumulating and Reporting Costs"; CAS 403 "Allocation of Home Office Expenses to Segments"; CAS 416 "Accounting for Insurance Costs"; and CAS 418 "Allocation of Direct and Indirect Costs." (R4, tab 34; app. mot. at 9; gov't opp'n at 2) KBRSI responded on 5 September 2006 regarding the contractor's allocated insurance and related expenses, and disagreed with the government's position that these expenses were charged in a manner noncompliant with CAS (R4, tab 35 at 202-03; app. mot. at 9; gov't opp'n at 2).

As requested by DCMA, DCAA issued its "Report on Audit of Fiscal Year 2006 [FPRR] for Burdens & Benefits and Procurement Service Center" dated 30 October 2006

(R4, tab 36; app. mot. at 10; gov't opp'n at 2). DCAA opined that KBR's allocation practices did not comply with CAS (R4, tab 36 at 5-6).

In 2010, DCAA again audited KBR's 2006 allocation methods for insurance costs and related expenses. On 22 September 2010, DCAA issued "Audit Report Number 3321-2006K19200006" with the subject line "Report on Noncompliance with CAS 416, Accounting for Insurance Costs." (R4, tab 2) According to the report's executive summary, KBRSI was noncompliant during the contractor's fiscal year [CFY or FY] 2006 due to the company's "practice of allocating Home Office and insurance cost to contracts using an allocation base that has no causal or beneficial relationship to the insurance expense." DCAA "estimate[d] $1.6 million dollars were misallocated in CFY 2006." (*Id.* at 8) The audit noted that "KBRSI is responsible for performance of the Logistics Civil Augmentation Program (LOGCAP III), Restore Iraqi Oil (RIO) program, Balkans Support Contracts, and Emergency [sic], and the Construction Capability Contract (CONCAP), to name a few" (*id.* at 18). A contract number is mentioned for only LOGCAP III, which is identified as Contract No. DAAA09-02-D-0007 (*id.* at 2).

Citing the results of the 22 September 2010 audit, the DCMA administrative contracting officer (ACO) on 4 November 2010 issued a notice of potential noncompliance with CAS 416. The ACO noted that the audit had disclosed that the contractor was "noncompliant with CAS 416, Accounting for Insurance Costs and FAR Part 31 regarding the [B&B] rate" due to the manner in which KBR allocated "Home Office and insurance costs." The ACO cited FAR 30.605(b)(2)(ii), and requested KBR either to agree that it was not in compliance; advise why KBR considered the existing practice to be in compliance; or submit a rationale to support a finding that the cost impact of noncompliance was not material. (R4, tab 3; app. reply at 2; gov't opp'n at 3)

Following DCAA's 2010 audit, KBR undertook an examination of its Risk Management Program, including its EL Program (app. mot. at 10; gov't opp'n at 3). On 14 January 2011, KBR told the ACO that it agreed with some (but not all) of the government's assertions of noncompliance with CAS 416, and agreed to modify some of its allocation methods (R4, tab 5 at 31). The contractor asserted that "payroll is the factor which represents the causal relationship between insurance and benefiting cost objective." KBR agreed that "the KBRSI apportionment of [EL] cost would better be allocated to government contracts through a G&A pool on a total cost input base." KBR's response did not address the cost impact of the contractor's noncompliance with CAS 416. (*Id.* at 32; app. reply at 2; gov't opp'n at 4)

KBR on 1 November 2011 submitted to DCMA its "CAS Disclosure Statement Amendments Effective January 1, 2012" (R4, tab 22). KBR advised that it would provide additional information, and requested that the government consider "postponing a request for a CAS cost impact proposal for the cost accounting practice changes which are referenced in this Disclosure Statement submission until after KBR completes all of its

6

revised final rate proposals and submits them to your office." With this additional information, the contractor could provide a "complete picture of the potential cost impact in the aggregate…related to changes KBR is making in its cost accounting practices, together with potential overpayments that may have occurred." (*Id.* at 3 of 26) KBR later credited the government with the difference in costs between the original allocation method and the revised allocation method (app. mot. at 11; gov't opp'n at 3; Kerr decl. ¶ 46).

KBR elaborated on its explanation about the manner in which it intended to allocate EL costs on 7 May 2012, but did not provide information regarding the cost impact of its approach (R4, tab 10).

The 26 July 2012 DCAA Audit Report No. 3321-2012N17900001 was entitled "Independent Audit of Kellogg Brown & Root Services, Inc. (KBR)'s Contractor Fiscal Year (CFY) 2006 Cost Accounting Practice Changes for Allocation of Purchased Insurance Premiums and Insurance Administrative Expenses" (R4, tab 13). This audit report examined KBR's revised allocation method, and determined that KBR's allocation of certain insurance costs and related expenses for FY 2006 remained noncompliant with CAS 416 (*id.* at 115, 117-22). The report referenced prior audit reports dated 9 June 2010, 22 September 2010, and 29 October 2010 (*id.* at 116-17).

Although the 26 July 2012 audit report does not identify any contract between appellant and the government by number, the following statement is included: "Several other significant contracts are no longer active in supporting the military but are under audit including the Iraqi reconstruction contract Restore Iraqi Oil (RIO), the Balkans Support Contract (BSC), CONCAP II, Construction Capability Contract (CONCAP) III, and the Gulf Region Division (GRD) Oil formerly known as Project and Contract Office (PCO) Oil" (R4, tab 13 at 124). The contractor was briefed on the audit at an exit conference on 26 July 2012, and the report indicated that the contractor said it would respond by 9 August 2012 to the findings in the audit report and state whether KBR agreed or disagreed with each (*id.* at 118).

Karen Killgore, the DCMA DACO, issued a COFD on 14 August 2012 (R4, tab 14). The DACO concluded that "KBR is noncompliant with CAS 416, Accounting for Insurance Costs." The contractor was required to "submit a description of the change necessary to correct" its noncompliance with CAS by 14 September 2012. (*Id.* at 133-34) In addition to other requirements, the DACO told KBR to "submit a General Dollar Magnitude (GDM) proposal in accordance with FAR 52.230-6(g)…by September 14, 2012." The DACO advised that if the contractor did not comply, the government would withhold monies from "each subsequent payment up to the GDM estimate" and issue another COFD unilaterally adjusting the contracts or demanding repayment. The government did not assert a monetary demand in this COFD. (*Id.* at 135; app. mot. at 11; gov't opp'n at 4)

KBR responded to the 26 July 2012 DCAA audit on 16 August 2012. The contractor stated that it did not agree with DCAA's findings, and did not provide a cost impact for the alleged CAS noncompliance. (R4, tab 15) DCAA on 5 September 2012 advised DCMA that it had reviewed KBR's response, but maintained the position expressed in its 26 July 2012 audit report (R4, tab 16 at 142, 150).

On 27 September 2012, KBR provided DACO Killgore with its GDM proposal for the cost impact of appellant's CAS 416 noncompliance (R4, tab 17). KBR advised that "[t]he overall impact to the KBRSI segment is ($1,420)M" (*id.* at 153). The contractor's GDM was reviewed by DCAA, which on 16 October 2012 provided the DACO with a Rough Order of Magnitude (ROM) of the cost impact of KBR's noncompliance with CAS 416 for CFY 2006 (R4, tab 18). The total ROM of $8,838,619, as calculated by DCAA, included $6,480,023 plus $2,358,596 in interest (*id.* at 159).

DACO Killgore issued a "Contracting Officer's Final Decision and Demand for Payment of Debt" on 29 October 2012 (R4, tab 19). The COFD referenced the government's 14 August 2012 COFD, which advised that KBR failed to comply with CAS 416 in CFY 2006, and added that the contractor failed to comply with CAS 403. The 29 October 2012 COFD faulted the contractor for not complying with these CAS provisions "in the allocation of insurance costs" for AL, GL, and EL. (*Id.* at 178) Killgore also alleged that "certain allocation bases proposed by KBR in its schedule dated May 18, 2012 for AL, GL, [EL], Commercial Crime, Commercial Property, Directors & Officers Liability [D&OL], and Insurance Administration Expense continue to be noncompliant with [both] CAS 416-40(b) and CAS 403-40(b)(4)," which "provide that insurance premiums should be allocated based on the factors used to determine the premium" (*id.* at 179). The DACO "assert[ed] a Government claim and demand in the amount of $8,838,619" (*id.* at 178). Killgore noted that KBR's proposed changes were not adequate to bring its accounting practices into CAS compliance (*id.*), and that the government regarded it as "prudent to rely on DCAA's calculation of the cost impact" because "KBR failed to provide a compliant practice for certain allocation bases" (*id.* at 180). The DACO "referenced and relied upon" the following documents in making her decision: the DCAA Audit Report of 26 July 2012; the DACO Determination of Noncompliance dated 14 August 2012; KBR's GDM Proposal dated 27 September 2012; and DCAA's 16 October 2012 Memorandum for Record (*id.* at 178).

The 29 October 2012 COFD was timely appealed to the Board on 24 January 2013, and was docketed as ASBCA No. 58518. With respect to the 14 August 2012 COFD, KBRSI filed a complaint in the United States Court of Federal Claims on 13 August 2013. The court granted KBRSI's motion to transfer that action to the ASBCA by order dated 8 November 2015. We docketed that matter as ASBCA No. 59005 and consolidated it with ASBCA No. 58518.

8

KBRSI moves for summary judgment, asserting that undisputed material facts show that it is entitled to judgment as a matter of law because the government's claims accrued more than six years before these were asserted and are untimely under the CDA, 41 U.S.C. § 7103. It urges that several documents show that the government knew or should have known that its claims had accrued more than six years before being made. This includes the government's nonmonetary claim of 14 August 2012 which stated that appellant was not in compliance with CAS 403 and 416, and its monetary claim of 29 October 2012 that demanded the contractor repay $8,838,619 in overcharges associated with the CAS violations. (App. supp. br. at 4-8) The contractor's CAS violations and resulting overcharges arise from the manner in which KBR in 2006 allocated insurance costs and related expenses to cost-reimbursement and time-and-materials contracts. KBRSI clarifies that, for purposes of its motion, "'insurance' refers to risk management insurance, such as [AL], [GL], Commercial Property [CP], and [D&OL] insurance," but does not include "group insurance such as health or dental insurance" (app. mot. at 2 n.2).

Appellant views the government's COFDs as asserting a single claim. It contends that DCMA asserted a single claim for repayment on 29 October 2012, more than six years after the claim accrued (app. mot. at 19). Appellant alleges that "the government bases the [29 October 2012] claim on a single event – the alleged noncompliance with CAS in allocating insurance costs and related expenses." Therefore, "the government's single overpayment claim in its October 29, 2012 Final Decision is barred by the [CDA's statute of limitations] as untimely" (id. at 20). KBRSI states that even if the "Board determines that the October 29, 2012 Final Decision asserts an unspecified number of individual claims based on unspecified invoices paid by the government under unspecified contracts and orders, all invoices paid prior to October 29, 2006 are barred" (id. n.20). KBRSI further contends that, "Even when [the two COFDs are] viewed as separate claims, which KBRSI does not concede, both claims are untimely" (app. reply at 1 n.1).

For purposes of deciding the motion, we treat the government's 14 August 2012 and 29 October 2012 COFDs as separate government claims.

*I. The CDA's Statute of Limitations and the Accrual of Claims*

As initially filed, appellant's "motion for judgment" asserted that the Board was without jurisdiction because the government's claims violated the CDA's statute of limitations as set forth in 41 U.S.C. § 7103 (app. mot. at 2-3). Subsequent to the motion, the United States Court of Appeals ruled in *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315 (Fed. Cir. 2014) that this six-year period was not a jurisdictional requirement. 773 F.3d at 1321. The Board allowed the parties the opportunity for further briefing and oral argument on the application of *Sikorsky*. Although KBRSI notes its continuing

disagreement with the Federal Circuit's opinion, it now styles its motion as one for summary judgment. It contends that it "has established that it is entitled to judgment that the CDA statute of limitations bars the government's monetary and nonmonetary claims as a matter of law based on the undisputed material facts." (App. supp. br. at 4)

The Board analyzed the application of the Federal Circuit's ruling in *Sikorsky* in *Kellogg, Brown & Root Services, Inc.*, ASBCA No. 58175, 15-1 BCA ¶ 35,988. Notwithstanding KBRSI's disagreement with the *Sikorsky* decision, we are bound to follow the precedent established by our appellate court. *Id.* at 175,825 (citing *E.L. Hamm & Associates, Inc.*, ASBCA No. 43972, 94-2 BCA ¶ 26,724 at 132,940; and *Reflectone, Inc.*, ASBCA No. 43081, 93-3 BCA ¶ 25,966). Although the six-year accrual period stated in 41 U.S.C. § 7103 is not regarded as jurisdictional, it remains important as a deadline for filing a claim. "Failure to meet a statute of limitations is an affirmative defense, for which the invoking party bears the burden of proof." *Kellogg, Brown & Root Services*, 15-1 BCA ¶ 35,988 at 175,825 (citing FED. R. CIV. P. 8(C); *Bridgestone/Firestone Research, Inc. v. Automobile Club de L'Ouest de la France*, 245 F.3d 1359, 1361 (Fed. Cir. 2001)). Unlike a motion to dismiss for lack of jurisdiction, in which the proponent for jurisdiction bears the burden of proof, *Sikorsky* dictates that KBRSI bears that burden as the party asserting untimeliness as an affirmative defense.

## II. The Standard for Summary Judgment

Summary judgment is an efficient measure for resolving suits in which there are no disputed material facts and the movant is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); FED. R. CIV. P. 56. "A movant for successful summary judgment must show, based solely upon the record now before us and without benefit of a hearing that there is sufficient and uncontroverted evidence to meet its evidentiary obligation as defined by law and precedent." *Osborne Construction Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,512. "Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmovant, there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Spectrum Pharmaceuticals, Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1333 (Fed. Cir. 2015) (citing FED. R. CIV. P. 56(a); and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). While "we determine whether disputed facts are present, the Board will not at this juncture serve as arbiters to resolve controversies nor weigh evidence or make determinations of credibility." *Osborne*, 09-1 BCA ¶ 34,083 at 168,513 (citing *Liberty Lobby*, 477 U.S. at 248).

10

### III. The Positions of the Parties

KBRSI argues various dates upon which it provided information that, it contends, was adequate for the government's nonmonetary and monetary claims to have accrued. At one point, it states that the "government's nonmonetary claims...accrued *no later than July 29, 2004*" and the "government's monetary claims...accrued *no later than February 6, 2006*" (*see, e.g.*, app. supp. br. at 7 n.3 referencing app. mot., app'x A and app. reply br., app'x A). KBRSI also contends that 27 July 2006 is the "Latest date that both claims accrued by [the] government's admission" (app. reply br. at 7 n.3). We separately evaluate the particular dates and the government's alleged "admission."

### A. The Government's Alleged Admission that Both Claims Accrued "on 27 July 2006"

KBRSI contends that "the government already has *conceded* that the 2006 B&B rates proposal and review established accrual of the nonmonetary claim by providing visibility into KBR's allocation methods" (app. resp. at 5 n.10 (citing gov't opp'n at 13-14), ex. G-2 (Najera decl.) ¶ 4; *see also* app. resp. at 2-3, 13-14; app. supp. br. at 7-8). The alleged government admission or concession refers to the following statement, which is taken from the government's brief in its opposition to appellant's motion: "It was during the DCAA audit process of the FY 2006 B&B rate proposal that certain information from KBR provided the visibility into the allocations for the pools and bases related to the Risk Management insurance costs" (app. resp. at 5-6 n.10 (citing gov't opp'n at 13; *see also* app. resp. at 14 n.15). Appellant explains the importance of 27 July 2006 as the date by which "KBRSI had submitted, and the government had in its possession, all the information necessary for the government to find CAS-noncompliance" (app. resp. at 9).

We are unpersuaded by appellant's reading of the government's statement as an admission or concession. As discussed below, the government maintains that KBRSI's 2006 B&B plan did not by itself provide the necessary visibility into the contractor's allocation practices, and that subsequent communications between the parties was necessary to afford adequate insight into appellant's accounting practices (*see, e.g.*, gov't opp'n at 13-21). Appellant has not shown that it is entitled to judgment based upon this isolated text, and the record is insufficiently developed to otherwise support such a finding.

11

## B. The Government's Nonmonetary Claim of 14 August 2012

*The Appellant*

KBRSI moves for summary judgment, arguing that the government's 14 August 2012 nonmonetary claim was untimely asserted because it accrued **"no later than *July 29, 2004*"** (app. supp. br. at 4, 7). Appellant cites a series of exchanges between the parties to support its contention that it had disclosed its allocation practices to the government prior to 14 August 2006 (*id.* at 5-8). Documents relied upon by KBRSI include correspondence between the parties concerning FY 2006 and those dealing with prior year rate allocations. These include the government's 17 April 1998 draft CIPR report for FYs 1995 and 1996 (R4, tab 37); a 31 May 2002 submittal regarding the contractor's self-insurance program (R4, tab 38); a 27 February 2004 email transmitting FYs 2001-2003 B&B rate development support for worker's compensation, general liability, and auto liability self-insurance (R4, tab 40); an 8 June 2004 email sending the government this information for FY 2004 (R4, tab 41); the 20 July 2004 submission of summary B&B rates for FYs 2003 and 2004 (R4, tab 42); a 23 November 2005 KBRSI forward pricing rate proposal (R4, tab 45); a 24 February 2006 KBRSI CAS Board Disclosure Statement, Revision 2-2005 (R4, tab 46); a 20 April 2006 KBRSI B&B rate proposal (R4, tab 20); and correspondence of 27 July 2006, when appellant supposedly made its last submission of information on insurance and related costs (R4, tab 53; app. mot., app'x A, Kerr decl. ¶¶ 24, 26-30, 34-41; app. reply br. at 12, 18-19, app'x A, Kerr supp. decl. ¶ 13; app. supp. br. at 5-8).

In addition to these, and critical to appellant's argument, are two government documents of 29 July 2004, which KBRSI contends fixed the date upon which the government knew or should have known that its nonmonetary claim had accrued. One is the "CONTRACTOR INSURANCE PENSION REVIEW [for] FYS 2001 and 2002" (R4, tab 43). According to KBRSI, this report "discussed the rate development for KBRSI's primary insurance and the composition and rate development for KBRSI's excess liability for Fiscal Years 2001 and 2002" (app. supp. br. at 5). The next document (R4, tab 44) is described by appellant as "a memorandum recommending forward pricing rates for Fiscal Years 2003 through 2008 for KBRSI, including burdens to be applied to payroll for KBRSI's insurance costs and related expenses" (app. supp. br. at 5-6; app. mot., app'x A; app. reply br., app'x A, Kerr decl. ¶¶ 32, 34). Based upon these "key disclosures" regarding the government's nonmonetary claim, appellant contends that it "has established that all of the events that fixed the alleged liability of KBRSI and permitted assertion of the government's nonmonetary claim were known or should have been known no later than July 29, 2004." KBRSI maintains that "All of the events should have been known when they occurred because they were not concealed or inherently unknowable." (App. supp. br. at 7)

12

*The Government*

The government opposes the motion (*see, e.g.,* gov't opp'n; gov't resp.; gov't supp. br.). It contends that "to be timely, the Government claim of CAS noncompliance must not have accrued before August 14, 2006" (gov't opp'n at 8). The government maintains that:

> KBR does not, and in fact cannot, point to one particular document that contains the necessary level of detail of its allocation practices that were disclosed to Government personnel such that the Government knew or should have known of the basis for the CAS noncompliance determination. Rather, KBR assembles a number of different documents that were prepared for a variety of reasons by various sources but none of which provide an adequate description of the allocation practices.

The government denies that the numerous "documents that, according to KBR, when taken together, reveal[ed] the allocation practices" by that date. (*Id.* at 11) Thus "KBR's argument that the Government knew or should have known of the noncompliant allocation practices before 2006 fails" (gov't opp'n at 11-12; *see also* Killgore decl. ¶¶ 4-14; Najera decl. ¶¶ 3-9; gov't resp., ex. G-4 (Najera supp. decl.) *passim*).

The government supports its position with declarations from employees who were involved with the CAS determination. Former DACO Karen Killgore has been with DCMA since February 2008, is currently corporate administrative contracting officer (CACO) "with the Corporate and Divisional ACO Group, Civil Augmentation Program (CAP) Team, Houston, Texas" and issued the 14 August 2012 COFD (gov't opp'n, ex. G-1 (Killgore decl.) ¶¶ 1-3). Killgore emphasized her responsibility as the DCMA contracting officer in determining whether the contractor was compliant with CAS, and distinguished the work of DCMA CIPR teams from that function. She stated that the role of CIPR teams was "not to address CAS compliance" and that the teams "defer[red] to DCAA on allocation issues" (*id.* ¶¶ 1-5; *see also* R4, tab 37). Killgore contends that documents relied upon by KBRSI in its motion, as well as the contractor's invoices (*see, e.g.*, R4, tabs 38-40, 42-46), do not adequately advise the government of the CAS noncompliance that was the subject of the government's 14 August 2012 COFD (Killgore decl. ¶¶ 7-16).

The government provides two declarations from Jennifer Najera, a supervisory auditor for DCAA at its KBR Resident Office in Houston, Texas. She has been employed by the agency since 2007 and is familiar with the CAS noncompliances in question. (Najera decl. ¶¶ 1-2) The first declaration is dated 22 April 2014 (*id.*) and the second 2 October 2014 (Najera supp. decl.). Najera explained that the "CAS 416 noncompliance exists within Halliburton's corporate structure at two points." The first

"occurred when Halliburton estimated costs and allocated those costs to two wholly owned subsidiaries, Energy Systems Group ("ESG") and KBR, based upon the historical ratio of insurance recoveries." She said that the "noncompliance occurred because the allocation base consisting of the historical ratio of insurance recoveries was not based upon the factors used to determine the premium." (Najera supp. decl. ¶ 1) A "CAS 416 noncompliance occurred when KBR developed the [AL, GL, and EL] rates to allocate costs across business segments and final costs objectives using payroll dollars. The noncompliance exists because the costs allocated to the AL, GL, and EL pool do not have a causal/beneficial relationship to payroll since the insurance costs benefit the corporation and not the employees." (*Id.* ¶ 2)

Najera stated that "[t]he first instance in which DCAA personnel noted potential CAS 416 and 403 noncompliances for risk management insurance costs occurred during DCAA's examination of KBR's [FY 2006 B&B] Rate Proposal dated April 20, 2006" (Najera decl. ¶ 3 referencing R4, tab 20). It was not until afterward, when this correspondence was being reviewed, that "DCAA was able to obtain information that provided visibility into the pools and bases of the B&B rates." According to Najera, previous submissions "did not include the level of detail necessary to determine CAS noncompliances related to [KBRSI's] risk management insurance practices." (Najera decl. ¶ 4; *see also* ¶¶ 5-8 referencing, *inter alia*, R4, tabs 41, 51-52, 54) She took exception to documents asserted by appellant to support its motion, and pointed out that it is the "allocation methodology, not the percentage, that caused the CAS 416 noncompliance." Najera referenced CAS 416-50(b)(2), and said that the "use of payroll alone does not make this a CAS 416 noncompliance"; rather, the noncompliance is due to the lack of a "causal/beneficial relationship." She maintained that the parties' exchanges, including an 8 June 2004 email and its attachment (R4, tab 41), did not adequately describe "the factors used to determine the premium" which would have allowed the government to assess whether "payroll is a factor used to determine the premium cost." (Najera supp. decl. ¶¶ 3-4 (citing R4, tab 41)). Najera said that it was not until the government received information following "KBR's July 20, 2006 response to DCAA's inquiry that KBR disclosed that the purchased insurance premiums were split between KBR and ESG based upon the historical ratio of insurance recoveries [*see* R4, tab 51]." She cited "KBR's responses on April 26, 2010 and May 4, 2010 regarding DCAA's questions about the insurance policies and coverages" in which appellant "provided the necessary information to conclude that payroll was not a compliant/appropriate base." (Najera supp. decl. ¶¶ 5-6, attach. A (26 April 2010 email exchange between Daniel Hong (DCAA) and Deborah Stacey (Halliburton) with a copy to Charlie Kerr (KBR) "RE: Questions CAS B&B") and attach. B (4 May 2010 email from Charlie Kerr to Daniel Hong regarding "DCAA Audit – 2006"))

The government also provided the 30 September 2014 declaration of Rasa O. Rafferty, who is currently an insurance/pension specialist with the CIPR team in Carson, California (gov't resp., ex. G-3 (Rafferty decl.)). Attachment A to Rafferty's

14

declaration is "DCMA-INST 107," entitled "Contractor Insurance/Pension Review" and dated 6 March 2014, which provides agency guidance for performing CIPRs. At paragraph 1.1.4, it references DFARS 242.7301(a)(d), which states that "the ACO is responsible for determining the allowability, reasonableness, and allocability of insurance/pension costs in Government contracts and for determining the need for a CIPR." (Rafferty decl., attach. A) Rafferty's declaration included a second attachment entitled "Contractor Insurance/Pension Review Data Request" (*id.* attach. B), which she described as "the typical data request sent to a contractor" (*id.* ¶ 4). Rafferty stated that she had "reviewed the CIPR files for FYS 2001 and 2002" relevant to this appeal, but that "[d]ue to the length of time that has elapsed since conducting the review in 2004, the backup data is no longer available" (*id.* ¶ 6).

Rafferty "prepared the Halliburton Kellogg Brown & Root CIPR Report for FYS 2001 and 2002, dated 29 July 2004," which appellant asserts as a key document evidencing the government's knowledge at that time of the CAS noncompliance that is the subject of the 14 August 2012 COFD. She stated that paragraph 4 of the 29 July 2004 report "concludes by stating the CIPR team did not have cost and pricing data to make a determination and therefore recommend[ed] disapproval of the costs." (Rafferty decl. ¶ 5 referencing R4, tab 44) Rafferty said that DCAA's 22 September 2006 Audit Report No. 3321-2006K19200006, Report on Noncompliance with CAS 416, "addresses FY 2006 allocation issues and the beneficial and causal relationship" and cites "CAS 416-40(b)" (*id.*¶ 7). "In contrast, the CIPR Report" of 29 July 2004 (R4, tab 44) "addresses FYS 2001 and 2002 contingency fees, citing FAR 31.205-7(a), and reserves not being properly discounted, citing CAS 416-50(a)(3)(ii)." She contended that the 22 September 2006 "DCAA audit report" covers "matters not reviewed or addressed by the CIPR team." (*Id.* ¶ 7)

In particular, the government states that the "two DCMA CIPR [team] Reports (App. R4, tabs 37, 43)" cited by KBRSI demonstrate insufficient knowledge for the monetary claim to have accrued. The government asserts that a "CIPR team comment that it did not find a CAS 416 noncompliance carries no weight in determining whether a claim accrued, because it is DCAA that has the necessary expertise." The government observes that the "second CIPR team report cited by KBR pertains to FAR 28.308, Approval for Self-Insurance and, correctly, does not address CAS noncompliance." It says that "CAS administration is not one of the team's functions. DCAA is identified as the agency for CAS administration audit responsibilities and it is DCAA's advice that is relied upon by the CACO." (Gov't opp'n at 11-12; *see also* Rafferty decl. ¶¶ 2-7; Najera supp. decl. ¶¶ 3-7)

### C.   The Government's Monetary Claim of 20 October 2012

*The Appellant*

KBRSI also seeks summary judgment with respect to the government's 20 October 2012 monetary claim, which seeks to recover $8,838,619 in overcharges attributed to the CAS violation.  Appellant contends that because undisputed material facts show that the government knew or should have known that its monetary claim accrued before 20 October 2006, this claim was untimely asserted in violation of 41 U.S.C. § 7103.  KBRSI reasons that the monetary claim accrued the first time the government paid the contractor's invoice that included the controverted charges.  It points to "Examples of KBR's Disclosures and the Government's Review of KBR's Allocation Practices Prior to October 29, 2006" to establish that appellant had furnished the government with information sufficient to know that the now-questioned insurance expenses were being allocated to payroll (app. mot., app'x A).  Appellant maintains that, charged with this knowledge, "the government's claim for repayment accrued *no later* than the date of its first claimed overpayment - January 24, 2006" (app. mot. at 3).  Charlie Kerr's declaration explained that "the first LOGCAP III invoice in 2006 charging the government for the insurance costs and related expenses was billed on January 16, 2006 and paid by the government on January 24, 2006" (Kerr decl. ¶ 45).

KBRSI subsequently asserted a date other than the 24 January 2006 for the accrual of this monetary claim that was relied upon in its motion.  It contends that the "government knew or should have known of the events establishing accrual of its monetary claim *as early as February 6, 2006*" (app. resp. at 13).  Although appellant reiterates this spare assertion (*id*. at 14 n.15), neither this submission nor its motion (including that document's statement of undisputed material facts (SUMF)) or any of its prior briefs furnish a reference to 6 February 2006 (*see, e.g.*, app. mot. at 4-12; and app. resp. at 7-8).  Information was discovered in a timeline provided in appellant's brief in response to oral argument, appendix C, "Accrual Based on the Government's Admissions."  This schematic indicates that on "February 6, 2006," the "Government paid [the] first part of 2006 insurance costs (KBRSI Rule 4 File, Tab 49)."  (App. resp. br., app'x C)  KBRSI does not reconcile this assertion with appellant's motion or its other submissions, which contend that the government's monetary claim accrued on 24 January 2006 (*see, e.g.*, app. mot. at 3, SUMF at 9, ¶ 18).

*The Government*

The government denies that its monetary claim of 29 October 2012, which sought to recover $8,838,619 in overcharges attributed to KBRSI's CAS violations, was untimely.  It maintains that it did not have sufficient knowledge of the CAS noncompliances to understand that the contractor's invoices contained the resulting

16

overcharges in time for the claim to have accrued more than six years before it was asserted. (Gov't opp'n at 7-8)

The government alleges a series of events that led to its having sufficient knowledge to assert the monetary claim. It states that this claim could not have been made when it issued the 14 August 2012 "COFD asserting the CAS noncompliance," because the government needed more information from the contractor regarding the magnitude of the charges, and time to analyze that response. (Gov't opp'n at 7-8) It states that "KBR had an affirmative duty to submit a cost impact proposal," which the contractor acknowledged "in its November 1, 2011 letter to the DCMA ACO in which it recommended that any impact be postponed." According to the government, that took approximately another 18 months. (Gov't opp'n at 18) The government argues that although it "became aware of potential CAS noncompliances in 2010," it did not know of the cost impact until after DCMA received DCAA's ROM on 16 October 2012, which assessed the contractor's GDM of 27 September 2012. The GDM proposal was part of appellant's response to the government's request for additional information regarding KBRSI's 20 April 2006 "FY 2006 B&B rate proposal," which the government maintains lacked sufficient information for the claim to accrue. (*Id.* at 18-19)

The government points to KBRSI's 7 May 2012 "Clarification of allocation bases for KBR Risk Management Excess Program" as appellant's acknowledgement that it was slow in furnishing the government with information about the monetary impact of the overcharges. This letter, signed by Charlie Kerr, stated that "The Company recognizes that as part of its communications and disclosure to your office regarding its compliance assessment of its Risk Management process, it should have communicated any impacts to previously documented positions. This should have been spelled out in our November 1, 2011 disclosure. KBR regrets any inconvenience that may have resulted from this omission." (Gov't opp'n at 17 (citing R4, tab 10 at 102); *see also* Najera supp. decl. ¶¶ 3-7, attachs. A, B)

## ANALYSIS

It is KBRSI's burden as movant for summary judgment on the grounds of an allegedly untimely claim to show by undisputed material facts that the government's nonmonetary claim accrued before 14 August 2006. *Sikorsky,* 773 F.3d at 1321. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Liberty Lobby,* 477 U.S. at 255; *see also* FED. R. CIV. P. 56(a).

"Fixing the date of accrual of a claim requires first that there is a 'claim' as defined in the Contract Disputes Act and associated regulation." *Kellogg Brown & Root Services, Inc. v. Murphy,* No. 2015-1148, slip. op. at 7 (Fed. Cir. May 18, 2016). As a claim accrues "when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known," our inquiry into the

date of accrual begins with ascertaining the "legal basis of the particular claim." *Gray Personnel, Inc.*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,475. We assess the point at which the CDA's six-year statute of limitations in 41 U.S.C. § 7103 begins to run using the "'should have been known' test of claim accrual which 'has a reasonableness component [based] upon what facts were reasonably knowable to the claimant.'" *Raytheon Company*, ASBCA No. 58849, 15-1 BCA ¶ 36,000 at 175,868 (quoting *Laguna Construction Company*, ASBCA No. 58569, 14-1 BCA ¶ 35,618 at 174,459). "Summary judgment is not normally appropriate where reasonableness and subjective knowledge are facts at issue." *Raytheon*, 15-1 BCA ¶ 36,000 at 175,868 (citing *MIC/CCS Joint Venture*, ASBCA No. 58242, 14-1 BCA ¶ 35,612 at 174,436; *The Boeing Co.*, ASBCA No. 54853, 12-1 BCA ¶ 35,054 at 172,198).

We address first that portion of the contractor's motion pertaining to the government's nonmonetary claim. We find that KBRSI failed to show that the documents it relies upon, including those in the Rule 4 file and others furnished with its briefs and motion, establish undisputed material facts sufficient for the Board to conclude (without more) that the government's 14 August 2012 claim was untimely. At this stage, the evidentiary record is not sufficiently developed to put these documents in context or explain their importance. The government's opposition, including supporting declarations, adequately controverts appellant's view of the evidence upon which its motion is founded (*see, e.g.,* Najera supp. decl. ¶¶ 5-6, attachs. A, B; Rafferty decl. ¶ 7). We do not on summary judgment "resolve factual disputes, but…ascertain whether material disputes of fact – triable issues – are present." *ESCgov, Inc.*, ASBCA No. 58852, 15-1 BCA ¶ 36,021 at 175,932 (citing *Connor Bros. Construction Co.*, ASBCA No. 54109, 04-2 BCA ¶ 32,784 at 162,143, *aff'd, Connor Bros. Construction Co. v. Geren*, 550 F.3d 1368 (Fed. Cir. 2008) (quoting *John C. Grimberg Co.*, ASBCA No. 51693, 99-2 BCA ¶ 30,572 at 150,969)). Drawing all justifiable inferences in favor of the government and making the requisite reasonableness determination, we find that triable issues are present and so deny appellant's motion for summary judgment on the issue of whether the government's nonmonetary claim of 14 August 2012 was timely.

Nor does KBRSI succeed in establishing undisputed material facts regarding the government's monetary claim of 29 October 2012 to warrant favorable judgment. Despite the panoply of documents cited in its motion, whether taken together or singly, these fall short of meeting KBRSI's burden of proof. Among other things, the contractor does not satisfactorily explain its 2010-2012 correspondence seeking additional time to furnish information and apologizing for any inconvenience caused the government (*see, e.g.,* R4, tabs 10, 15, 17, 22; Najera supp. decl., attachs. A, B). Nor does it adequately address the CO's admonition in the 14 August 2012 COFD that KBR must furnish a GDM or that the government would begin unilaterally withholding money (R4, tab 14), and the government's argument that it could not have known the amount of its monetary claim until it received KBRSI's GDM on 27 September 2012 (R4, tab 17). We find the current record to be inadequate to sustain a finding that KBRSI has established that the

government knew or should have known of the contractor's allocation practices for the subject contracts. As triable issues again remain, we deny that portion of KBRSI's motion pertaining to the government's monetary claim of 12 October 2012.

## CONCLUSION

We deny KBRSI's motion for summary judgment with respect to the government's 14 April 2012 nonmonetary claim and its 29 October 2012 monetary claim.

Dated: 16 June 2016

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58518, 59005, Appeals of Kellogg Brown & Root Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals